SCANNED

FILED

IN THE UNITED STATES DISTRICT COURT ~~BILLINGS DIV.~~

FOR THE DISTRICT OF MONTANA MAY 15  AM 8 44

BILLINGS DIVISION

PATRICK E. DUFFY, CLERK

BY _____

DEPUTY CLERK

| | |
|---|---|
| THE CLOUD FOUNDATION, INC., a Colorado non-profit organization, and FRONT RANGE EQUINE RESCUE, INC., a Colorado non-profit organization, <br><br> Plaintiffs, <br><br> vs. <br><br> DIRK KEMPTHORNE, in his official capacity as Secretary, United States Department of Interior, JAMES L. CASWELL, in his official capacity as Director, Bureau of Land Management, SANDRA S. BROOKS, in her official capacity as Field Manager, BLM, Billings Field Office, LINDA COATES-MARKLE, in her official capacities as Research Coordinator, Wild Horse and Burro Program, Bureau of Land Management and Montana State Wild Horse and Burro Specialist, Bureau of Land Management, <br><br> Defendants. | CV-06-111-BLG-RFC-CSO <br><br><br> **FINDINGS AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE** |

Plaintiffs The Cloud Foundation, Inc., and Front Range Equine Rescue, Inc.

(collectively "Cloud Foundation") filed this action against Dirk Kempthorne, et al.

(collectively "BLM") alleging violations of the Administrative Procedures Act ("APA"),

National Environmental Policy Act ("NEPA"), and Wild Free Ranging Horses and Burros

Act of 1971 ("Wild Horses Act"). *See First Amended Complaint (Court's Doc. No. 81).*[1]
By Order dated January 22, 2007, United States District Judge Richard F. Cebull
referred this case to the undersigned for all pretrial proceedings pursuant to 28 U.S.C. §
636(b)(1)(A) including submission of proposed findings and recommendations. *Court's
Doc. No. 57.* Pending before the Court are the parties' cross-motions for summary
judgment. *Court's Doc. Nos. 112, 115.* Having considered the parties' submissions and
the applicable law, the Court will recommend granting the BLM's motion, and denying
the Cloud Foundation's motion.

## I.    BACKGROUND

The Pryor Mountain Wild Horse Range ("PMWHR") was created in 1968 by order
of the Secretary of the Interior. *Admin. Record, Doc. 4, Environmental Assessment,
Bates 41 ("EA").* The PMWHR encompasses approximately 39,650 acres of BLM,
National Park Service, United States Forest Service, and private land, located in Carbon
County, Montana, and extending into Bighorn County, Wyoming. *Id.* The PMWHR is an
extremely diverse and complex area topographically, geologically, and ecologically.
*Admin Record, Doc. 19, PMWHR Survey and Assessment, Bates 734.* Environment and
elevation in the PMWHR vary from a sagebrush/salt-shrub dominated desert at 3,850

---

[1]The First Amended Complaint contains six counts: (1) violation of NEPA and APA by the
BLM, (2) violation of Wild Horses Act and APA by BLM, (3) violation of Wild Horses Act and APA
by BLM and U.S. Forest Service, (4) violation of Wild Horses Act and APA by BLM, (5) violation
of NEPA and APA by BLM, and (6) violation of Wild Horses Act and APA by U.S. Forest Service.
The U.S. Forest Service has already been granted summary judgment. *See Court's Doc. No.
111.* The parties make no arguments regarding counts 3 and 4, neither of which appears to
state a viable claim; thus, the Court will not address these counts in its analysis below.

feet at the southern end of the range in Wyoming to subalpine habitat at 8,750 feet in Montana at the high point of the range. *Id.* The PMWHR was established to protect a population of wild horses of Spanish ancestry, wildlife, watershed and recreational, archeological, and scenic values. *First Amended Complaint at ¶ 25; Answer (Court's Doc. No. 82) at ¶ 17.*

In 1984, the BLM issued a herd management area plan ("HMAP") establishing an initial population level of 121 wild horses for the PMWHR. *Admin. Record, Doc. 18, HMAP, Bates 634.* In 1992, the BLM issued a final decision modifying the 1984 HMAP, and establishing an appropriate management level ("AML") of 95 head of wild horses. *Admin. Record, Doc. 15, Bates 588.* If the population exceeded 125 head, a major roundup would be scheduled, with selected horses removed to adjust the population to within plus or minus 10% of the AML, with the exact number at the discretion of the authorized officer based on forage and range conditions, animal health, and the size of the foal crop. *Id., Bates 588-89.* From 1997 to 2005, 100 horses were removed from the PMWHR. *EA, Bates 40-41.*

For the years 2001, 2002, 2003, 2004, and 2005, the BLM administered the fertility control vaccine Porcine Zona Pellucida ("PZP") to certain mares on the PMWHR, after an Environmental Assessment and Finding of No Significant Impact issued each year. *Admin. Record, Docs. 5-14.*

On June 29, 2006, the BLM issued a Decision Record and Finding of No Significant Impact ("DR/FONSI"), stating that all mares on the PMWHR 11 years and

3

older would receive PZP, beginning July 10, 2006, with annual boosters administered through 2010. *Admin. Record, Doc. 3, DR/FONSI, Bates 5.* Additionally, from July 10 to September 30, 2006, up to 22 age-specific horses (11 "bachelor" stallions age 4-8 years and 11 yearlings) would be removed by bait-trapping. *Id.* The BLM's stated rationale was to "manage for healthy horses on healthy rangelands," and a "need to reduce wild horse grazing impacts on the PMWHR." *Id.* The BLM found that 76% of range transects on the PMWHR exhibited an apparent downward trend. *Id., Bates 12.* By the BLM's account, as of June 29, 2006, the PMWHR herd consisted of 160 adult horses, comprised of 138 horses 2 years and older, and 22 yearlings. *Id., Bates 5.* Additionally, up to 38 new foals were expected in 2006. *Id.* The DR/FONSI was based on an EA by the BLM dated April 7, 2006. *EA, Bates 37.* The BLM states, and the Cloud Foundation apparently agrees, that the "gather" portion of the decision record at issue has already been completed and any issues related to the 2006 removals are moot. *BLM's Br. Supporting MSJ (Court's Doc. No. 113) at 1.*

## II.    PARTIES' ARGUMENTS[2]

The BLM argues that it decided to remove 22 horses, and to continue fertility control by administering PZP to all mares 11years and older, based on the 1992 HMAP and its 95 horse AML, a comprehensive 2004 study by the Natural Resources

---

[2]In addition to the arguments summarized here, both parties submitted post-decisional declarations.  The Court is limited to the administrative record as it existed at the time the challenged decision was made, thus these documents (Court's Doc. Nos. 118, 120, 123) were not considered and are hereby stricken from the record.  Southwest Center for Biological Diversity v. U.S. Forest Service, 100 F.3d 1443, 1450 (9th Cir. 1996).

Conservation Service ("NRCS") showing deteriorating range conditions on the PMWHR, and the BLM's own range observations. *U.S.'s Br. Supporting MSJ (Court's Doc. No. 113) at 3.* The BLM states that under the APA and NEPA, court review of agency actions is highly deferential. *Id. at 5-6.* This includes an agency decision to issue an EA and FONSI instead of an EIS. *Id. at 7-8.*

Further, the BLM argues, the WFRHBA provides the BLM broad discretion in managing wild horse herds. *Id. at 8-10.* The BLM must strike a balance between horses and other considerations, and may utilize removal or fertility control to do so. *Id.* The BLM took a hard look at range conditions. *Id. at 13-15.* In this case, horse numbers on the PMWHR exceed management plan limits, and are causing range deterioration. *Id. at 10-15.*

The BLM also argues that it took a hard look at the reliability and necessity of PZP use. PZP has been used on wild horse herds for at least 17 years, and at the PMWHR since 2001. The manner in which the BLM plans to use PZP has minimal negative side effects and is reversible. The BLM has taken a hard look at the consequences of its decision to give older mares PZP from 2006-2010, and that decision is entitled to deference. *Id. at 17-18.* The BLM argues that the proposed management will improve range conditions while maintaining the genetic diversity of the wild horse herd. *Id. at 18-19.*

Responding to the Cloud Foundation's arguments, the BLM argues that, in the EA, it took a hard look at cumulative impacts. *U.S.'s Response (Court's Doc. No. 122)*

*at 8-13.* This includes the past and future cumulative impacts on the range,

necessitating a reduced horse population. *Id. at 9-10.* It also includes the cumulative

impacts of PZP administration. *Id. at 11-13.* The BLM also argues that the EA includes

a detailed discussion of mitigation measures. *Id. at 14-17.* In addition, the EA analyzes

and studies appropriate alternatives, in accordance with NEPA. *Id. at 17-19.*

Finally, in its reply, the BLM emphasizes again the deferential standard of review,

and argues that the Cloud Foundation has "misunderstood" the administrative record in

certain respects. *Def.'s Reply (Court's Doc. No. 127) at 2.* Specifically, the BLM argues

that the Cloud Foundation is mistaken when it claims that the EA cites only one study to

support PZP use, that the BLM lacks agency expertise in the area of PZP administration,

that the EA is flawed because it relies on an outdated AML set in the 1992 HMAP, and

that certain statements were omitted from the administrative record. *Id. at 2-9.*

The Cloud Foundation argues that the BLM's decision is inadequate in several

respects. First, the BLM's failure to prepare an EIS regarding its five year management

action violates NEPA and the APA. *Pls.' Mem. Supporting MSJ (Court's Doc. No. 116) at*

*4-6.* Multi-year actions with a cumulative effect must be considered in an EIS. *Id. at 4.*

Also, an EIS is required where the effects of agency action, such as PZP application, are

highly uncertain. *Id. at 5-6.*

Second, the BLM failed to take a hard look at the proposed action, in violation of

NEPA and the APA. *Id. at 6-12.* The BLM failed to discuss cumulative impacts and

mitigation measures, instead merely listing cumulative impacts and mitigation

6

measures, and not even providing a perfunctory description of the means of mitigation. *Id. at 6-9.* The BLM also used Dr. Cothran's letter regarding genetic impacts on the horse herd in a misleading fashion and did not provide the entire letter, constituting a serious misrepresentation to the public. *Id. at 9-12.*

Third, the BLM violated NEPA and the APA by not disclosing that treating the PMWHR herd with PZP was largely experimental. *Id. at 12-14.* The BLM plans to administer PZP to determine how it reacts in wild horses, and did not disclose some of the negative effects PZP had on PMWHR mares receiving the drug from 2001-2004. *Id. at 13-14.*

Fourth, the EA and DR did not properly address alternatives to the proposed action, especially natural controls on population. *Id. at 15.* The closely related fifth problem is that the BLM's proposed actions violate the WFRHBA because they are not "at the minimum feasible level."

Responding to the BLM's arguments, the Cloud Foundation reiterates many of the points above, and adds the following. The BLM is not administering PZP to improve the range; the herd is being used as part of an experimental protocol by the United States Geological Survey, Biological Resources Division ("USGS-BRD"), a fact not disclosed in the EA/DR. *Pls.' Mem. Opposing Defs.' MSJ (Court's Doc. No. 124) at 2.* Further, the BLM has not explained why in the past it has conducted an annual EA for each PZP administration, but has now issued a multi-year EA for PZP application. *Id. at 3-4.* Also, the BLM relied on outdated information, the 1992 HMAP, which prevented it

7

from taking a hard look at the environmental consequences of its actions. *Id. at 8-9.*

Finally, in its reply, the Cloud Foundation revisits many of the arguments above, adding that the BLM has failed to respond to Plaintiffs' Statement of Material Facts Not in Dispute, and that counsel for the BLM in briefing misrepresents the record. *Pls.' Reply (Court's Doc. No. 128) at 2, 8-10.*

## III.    DISCUSSION

The issue before the Court is whether the BLM's decision, pursuant to its EA, to make a Finding of No Significant Impact regarding its proposed PMWHR management actions, was arbitrary and capricious.

### A.    Summary Judgment Standard

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable trier of fact to return a verdict for the nonmoving party. Id.

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the

8

moving party. But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." Celotex Corp., 477 U.S. at 323.

## B.    APA and NEPA

This Court reviews NEPA challenges to agency actions pursuant to the APA, which provides that an agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law[.]" 5 U.S.C. § 706(2)(A). Agency decisions "are entitled to a presumption of regularity. But that presumption is not to shield the agency's action from a thorough, probing, in-depth review." NRDC v. Winter, 518 F.3d 658, 688 (9th Cir. 2008) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971)).

Under NEPA, a federal agency must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). When, as here, the "agency's regulations do not categorically require the preparation of an EIS, then the agency must first prepare an EA to determine whether the action will have a significant effect on the environment." NRDC, 518 F.3d at 687 (citing Nat'l Parks

9

& Conservation Ass'n v. Babbitt, 241 F.3d 722, 730 (9th Cir. 2001)).  The agency must

prepare an EIS if the proposed action will significantly affect the environment; if the

project's effect will be insignificant, the agency issues a FONSI.  Id. at 687-88.  Further,

the agency must prepare an EIS if "substantial questions are raised as to whether a

project may cause significant degradation of some human factor."  Idaho Sporting

Congress v. Thomas, 137 F.3d 1146, 1149 (9th Cir. 1998) (emphasis in original,

quotation omitted).  Thus, to trigger the EIS requirement, it is sufficient for a plaintiff to

"rais[e] substantial questions whether a project may have a significant effect."  Id. at

1150 (quotation omitted).

　　　The arbitrary and capricious standard under which a court reviews the agency

decision not to prepare an EIS "requires a court to ensure that an agency has taken the

requisite 'hard look' at the environmental consequences of its proposed action, carefully

reviewing the record to ascertain whether the agency decision is founded on a reasoned

evaluation of the relevant factors."  Wetlands Action Network v. U.S. Army Corps of

Engineers, 222 F.3d 1105, 1114 (9th Cir. 2000) (citing Greenpeace Action v. Franklin, 14

F.3d 1324, 1332 (9th Cir. 1992)).   The agency must provide a "convincing statement of

reasons to explain why a project's impacts are insignificant."  NRDC, 518 F.3d at 688

(quotation omitted). This is a deferential standard of review, and the court "cannot

substitute [its] judgment for that of the agency."  Id.  Thus, "the agency's decision will

only be overturned if the agency committed a 'clear error in judgment.'" Id. at 1114-15

(citing Northwest Environmental Defense Center v. Bonneville Power Admin., 117 F.3d

1520, 1536 (9th Cir. 1997).  NEPA does not mandate particular results, "but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions."  High Sierra Hikers Ass'n v. Blackwell, 381 F.3d 886, 896 (9th Cir. 2004).

After a thorough review of the administrative record, the Court concludes that the BLM has taken a hard look at the environmental effects of its proposed management actions, and that the BLM based its Finding of No Significant Impact on a reasoned evaluation of the relevant factors.  The BLM based its decision on a range of scientific data, *(EA, References Cited, Bates 78-80)*, and appropriately considered direct, indirect and cumulative impacts, *(EA, Bates 64-76)*, mitigation measures, *(EA, Bates 64-75, Appx. 3 Bates 83-87, Appx. 4 Bates 88-97)*, and alternatives *(EA, Bates 54-62)*.

The Cloud Foundation's principal contentions are that the EA is inadequate due to an insufficient discussion of cumulative impacts, the uncertain effects of PZP, and insufficient discussion of mitigation and alternatives.  These arguments are ultimately unpersuasive.

### 1.    Cumulative Impacts

A cumulative impact is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions[.]"  Northern Alaska Environmental Center v. Kempthorne, 457 F.3d 969, 980 (9th Cir. 2006); 40 C.F.R. § 1508.7.  "Both connected actions and unrelated but reasonably foreseeable future actions may result in cumulative impacts

11

that can trigger an EIS." Inland Empire Pub. Lands Council v. Schultz, 992 F.2d 977, 981 (9th Cir. 1993).

The Cloud Foundation argues that the BLM cannot prepare an EA for a multi-year action, presumably because the cumulative impacts of a multi-year action cannot be adequately addressed in an EA. In support, the Cloud Foundation cites High Sierra Hikers Ass'n v. Blackwell, 381 F.3d 886 (9th Cir. 2004), in which the Ninth Circuit held that the United States Forest Service ("USFS") violated NEPA by issuing multi-year special use permits to commercial packers for the John Muir and Ansel Adams Wilderness Areas without first completing an EIS. 381 F.3d at 896-97. High Sierra Hikers Ass'n does not, however, state a general rule that a multi-year action requires an EIS, nor is it factually comparable to this case.

In High Sierra Hikers Ass'n, the USFS proceeded to issue the special use permits to commercial packstock operators without first analyzing the environmental impact at all. Id. at 896. An agency decision to not prepare an EIS for a proposed action, without first conducting an EA, is reviewed under the reasonableness standard. Id. Thus, in the context of no EA, the cumulative impacts of the numerous multi-year special use permits, and a less deferential reasonableness standard of review, the Ninth Circuit concluded that the USFS violated NEPA. Id. at 896-97.

This case presents a very different situation. The BLM has prepared an EA considering cumulative impacts. The factual scenarios – impacts of commercial use in wilderness areas versus fertility control use on wild horses – are dissimilar. Finally, the

standard of review here is the highly deferential arbitrary and capricious standard, not
the reasonableness standard.  As the BLM notes, it is under no obligation to explain why
it has chosen to issue a multi-year EA, and High Sierra Hikers Ass'n cannot fairly be
read to require an EIS on these facts.  Further, the BLM has already taken similar
actions annually for five years, reducing any uncertainty regarding the effects of the
multi-year action.  The EA also includes significant ongoing monitoring and mitigation
over the course of this multi-year proposal.  The BLM does not violate NEPA by issuing
a multi-year EA here.

Finally, the Cloud Foundation's charge that the EA merely lists cumulative
impacts is incorrect.  The EA does contain the section cited by the Cloud Foundation,
which lists potential cumulative impacts on the PMWHR herd. *See Cloud. Found. Mem.
Supporting MSJ at 7.*  Following the listing of cumulative impacts, however, is
approximately a full page discussion of cumulative impacts, and citation to additional
discussion and tables in the EA addressing cumulative impacts. *EA, Bates 31-31.*

The Court concludes that the EA's discussion of cumulative impacts is consistent
with the requisite "hard look" the BLM was required to take at its proposed actions.  See
e.g. Inland Empire Pub. Lands Council v. Schultz, 992 F.2d 977, 981-82 (9th Cir. 1993).

## 2. High Degree of Uncertainty

The Cloud Foundation argues that PZP administration is experimental, and its
effects uncertain.  A consideration in evaluating the significance of a proposed action's
effects on the human environment is "[t]he degree to which the possible effects on the

13

human environment are highly uncertain or involve unique or unknown risks." 40 C.F.R. § 1508.27(5) (2007). Thus, an agency generally must prepare an EIS for proposed actions with highly uncertain environmental effects. Native Ecosystems Council v. USFS, 428 F.3d 1233, 1240 (9th Cir. 2005). Information in the record that is merely favorable to a plaintiff's argument, however , "does not necessarily raise a substantial question about the significance of a project's environmental effects." Id. NEPA does not require "the preparation of an EIS any time that a federal agency discloses adverse impacts on wildlife species or their habitat or acknowledges information favorable to a party that would prefer a different outcome." Id. Rather, the fundamental question remains whether the agency took a hard look at the environmental consequences of its proposed action. Id. (holding that effects of forest thinning project on northern goshawks not highly uncertain despite, *inter alia*, possible declines in some prey species. Id. at 1242-43.).

Here, the fact that documents in the record show some mares experience adverse side effects from PZP, and some variability in the efficacy of PZP, does not mean the BLM's decision not to issue an EIS was arbitrary and capricious. The EA cites eight different scientific sources in support of fertility control use. *EA, Bates 78-80.* Additionally, the EA incorporates previous NEPA documents, such as EA# MT-010-02-22, which lists additional studies. *Admin. Record, Doc. 12, App. 6, Bates 371-72.* Finally, the BLM administered PZP to the PMWHR for five years prior to this proposed action.

14

The administrative record reflects a hard look by the BLM at the effects of fertility
control use.  BLM's decision not to issue an EIS is not rendered arbitrary and capricious
by "high uncertainty" associated with PZP use.   See Greenpeace Action v. Franklin, 14
F.3d 1324, 1335-36 (9th Cir. 1992) (National Marine Fisheries Service not arbitrary and
capricious for issuing FONSI despite acknowledging uncertainties in proposed action's
effects on Steller sea lion).

### 3.    Mitigation

The Cloud Foundation argues that the EA "fails to include any meaningful
discussion involving mitigation measures, merely stating, 'Mitigation measures will be
provided as needed .... [i]n order to mitigate the impacts of fertility control, all vaccine
would be controlled, handled, and administered by trained, certified, and experienced
wildlife darters."  *Cloud Found. Mem. Supporting MSJ (Court's Doc. No. 116) at 8.*
Thus, "the public is kept in the dark as to even what mitigation measures BLM will
employ[.]" *Id. at 9.*

An agency's FONSI may be justified by the presence of mitigating measures.
Wetlands Action Network v. U.S. Army Corps of Engineers, 222 F.3d 1105, 1121 (9th Cir.
2000).  "If significant measures are taken to mitigate the project's effects, they need
not completely compensate for adverse environmental impacts."  Id. (internal
quotations omitted).  Mitigation measures are adequate when they are "carefully
considered, based on evidence from scientific studies, and reasonably designed to
protect [the species at issue]," even if some uncertainty as to the efficacy of the

15

measures remains. Greenpeace Action, 14 F.3d at 1335.

In Greenpeace Action, the Ninth Circuit affirmed the district court's holding that it was not arbitrary and capricious for the National Marine Fisheries Service ("NMFS") to decide not to prepare an EIS for a plan to allow continued pollock fishing in the Gulf of Alaska. 14 F.3d at 1336. Though past pollock fishing may have harmfully impacted the Steller sea lion's food supply, and NMFS conceded the efficacy of the proposed mitigation was uncertain, the Ninth Circuit found carefully considered, scientifically based mitigation to be sufficient. Id.

The BLM does not argue, nor does the Court conclude, that mitigation is necessary to justify a FONSI here. The EA does, nonetheless, contain mitigation measures. The two sentences cited by the Cloud Foundation disregard other mitigation discussion in the EA. In fact, the EA includes several pages of discussion regarding potential impacts and numerous specific mitigation measures. See EA, Bates 64-75. Further, attached to the EA are appendices 3 and 4, which set forth protocol and procedure for PZP administration and bait-trapping, respectively, and include more discussion of mitigation. See EA, Appx. 3 Bates 83-87, Appx. 4 Bates 88-97. Although the Cloud Foundation does not agree that these measures are adequate, one is not left to wonder what mitigation employed by the BLM might entail. The Court may not grant the Cloud Foundation's motion merely because it may disagree with aspects of the EA.

### 4.    Alternatives

The Cloud Foundation also claims that "the BLM did not propose nor analyze

16

alternatives to the invasive actions of applying fertility control and removing wild horses

from the range." *Cloud. Found. Mem. Supporting MSJ at 15.* This assertion is contrary

to the record.  The EA discusses four alternatives in detail, including two alternatives

with no PZP administration, and one alternative with no removals or PZP administration:

"no action," and "gather and removal only," respectively.  *EA, Bates 54-61*.  For all four

alternatives, expected impacts on the PMWHR range and horse herd are discussed.  *EA,*

*Bates 54-61, 64-76.*

Under the APA, the Court's role is not to second guess the BLM's decision, but to

ensure that the BLM took a "hard look" at its actions.  Here, the BLM's EA includes a

detailed statement on alternatives to the proposed action, in accord with NEPA.  See 42

U.S.C. § 4332(2)(C)(iii); see also American Horse Protection Association v. Watt, 694

F.2d 1310, 1318-19 (D.C.Cir. 1982).

### 5.   Conclusion

The Court concludes that the EA's discussion is consistent with the requisite

"hard look" the BLM was required to take at its proposed actions.  The BLM's decision

"is founded on a reasoned evaluation of the relevant factors."  Wetlands Action

Network, 222 F.3d at 1115.  Thus, "this court must defer to an agency's decision that is

'fully informed and well-considered.'" Northern Alaska Environmental Center, 457 F.3d

at 975 (quoting Save the Yaak Comm. v. Block, 840 F.2d 714, 717 (9th Cir. 1988)).

### C.   THE WILD HORSES ACT

Since 1971 the BLM has had the responsibility to oversee and manage wild

17

horses on public lands. <u>Fund for Animals v. U.S. BLM</u>, 460 F.3d 13,15 (D.C.Cir. 2006).

The Secretary of the Interior, and the BLM as delegate, are to "manage wild free-

roaming horses and burros in a manner that is designed to achieve and maintain a

thriving natural ecological balance on the public lands." <u>Id.</u> (quoting 16 U.S.C. §

1333(a)). The BLM manages wild horses in localized herd management areas

("HMAs"). <u>Id.</u> (citing 16 U.S.C. § 1332(c); 43 C.F.R. § 4710.3-1). The BLM determines

an AML for each HMA, based upon the number of adult wild horses or burros consistent

with "achieving and maintaining a thriving ecological balance and multiple-use

relationship in a particular herd area." <u>Id.</u>

When the BLM determines, on the basis of relevant information, "that an

overpopulation exists on a given area of the public lands and that action is necessary to

remove the excess animals," the Wild Horses Act requires that the BLM "immediately

remove excess animals from the range so as to achieve appropriate management

levels." 16 U.S.C. § 1333(b)(2). The BLM is to "determine whether appropriate

management levels should be achieved by removal or destruction of excess animals, or

other options (such as sterilization or natural controls on population levels)." 16 U.S.C.

§ 1333(b)(1).

The Wild Horses Act, like NEPA, does not contain a specific statutory review

provision. <u>Id.</u> at 18. Thus, the Court reviews through the APA the Cloud Foundation's

claims that the BLM's actions violate the Wild Horse Act. <u>Id.</u>; <u>American Horse Protection</u>

<u>Ass'n v. Frizzell</u>, 403 F.Supp. 1206, 1217 (D.Nev. 1975). The Wild Horse Act gives the

Secretary of Interior, and thus the BLM, a high degree of discretionary authority in managing wild horses on public lands. American Horse Protection Ass'n, 403 F.Supp. at 1217.  While the Wild Horses Act plainly gives the BLM broad discretion, that discretion has limits.  For example, the BLM may not choose inhumane management options, and must "protect and manage wild free-roaming horses and burros as components of the public lands."  16 U.S.C. § 1333(2)(A), (C); (1).  Thus, the Court has some law to apply, namely, is the decision not to issue an EIS "a violation of the [BLM's] duty to protect wild horses?"  American Horse Protection Ass'n, 403 F.Supp. at 1217.

The Court concludes that the BLM has not acted arbitrarily and capriciously regarding its duties under the Wild Horses Act.  The BLM has broad discretion under the Wild Horses Act, and the arbitrary and capricious standard of review from the APA is highly deferential.  While the BLM must protect wild horses on the PMWHR as a component of the public lands, the BLM must also maintain a thriving ecological balance on those lands.

Here, the BLM concluded that the PMWHR range conditions are deteriorating on the basis of relevant scientific information, as detailed in the EA.  Further, it is undisputed that the size of the herd exceeds the AML.  Thus, the BLM concluded that to maintain a thriving ecological balance, the herd should be reduced to nearer the AML through removal and/or sterilization.  These actions are expressly authorized by the Wild Horses Act, and are arguably in the best long-term interests of the horses themselves.  See American Horse Protection Ass'n, 403 F.Supp. at 1217-18

19

Under the Wild Horses Act, the BLM's actions also must be humane and at the minimum feasible level. In this regard, it is notable that the Humane Society of the United States ("HSUS") supports PZP use, "applaud[ing] the decision [to administer PZP to horses on the PMWHR] as the right thing for horses." *Admin. Record, Doc. 119, Bates 2519.* The HSUS, "the nation's largest animal protection organization," takes the position that fertility control "offers significant benefits to the wild horses," and will "reduce the impact of wild horses on the range" and the need for subsequent gathers. *Id., Bates 2519-20.* The HSUS's position that PZP use as humane, desirable, and effective, is based on the credible and highly qualified opinion of Dr. Allen T. Rutberg. *Admin. Record, Doc. 118, Bates 2512-18.* Given its broad discretion, the BLM's proposed PZP use does not violate the Wild Horses Act requirements that horse management be humane and at the minimum feasible level.

The Cloud Foundation has consistently argued that the BLM must engage in the minimum feasible level of horse management. It appears to the Court that the BLM's use of limited removals and annual PZP administration is a reasoned attempt to do just that. When, pursuant to a reasoned and informed decision, the BLM determines range degradation and horse overpopulation exist, the BLM apparently has the authority to conduct far more invasive management, including more extensive removals and "destruction of excess animals[.]" See 16 U.S.C. § 1333(b)(1),(2).

The BLM is within its discretion under the Wild Horses Act to decide that the proposed management actions are necessary. The Court cannot say, under the

20

arbitrary and capricious standard, that the BLM's proposed actions violate the Wild

Horses Act.

## IV.   CONCLUSION

Based on the foregoing, the Court **RECOMMENDS** that the BLM's Motion for

Summary Judgment (Court's Doc. No. 112) be **GRANTED**, and the Cloud Foundation's

Motion for Summary Judgment (Court's Doc. No. 115) be **DENIED**.

The Clerk of Court shall serve a copy of the Findings and Recommendation of the

United States Magistrate Judge upon the parties.  The parties are advised that,

pursuant to 28 U.S.C. § 636, any objections to these findings must be filed within ten

(10) days after receipt hereof, or objection is waived.

DATED this 15th day of May, 2008.

Carolyn S. Ostby
United States Magistrate Judge